In the Matter of the Estate of JULIA ANNE COOKE, Deceased.

Surrogate's Court, Kings County, September 2, 1933.

*S. M. & E. E. Meeker* [*John C. Loud* of counsel], for the distributees.

*John Collins*, for the executor.

WINGATE, S.   Julia Anne Cooke died on March 9, 1928, leaving a will by which she appointed Everett Stanton as sole executor without bond.   This instrument was admitted to probate on March twenty-ninth and the executor named duly qualified in that capacity. For some time prior to her death the decedent had employed Joseph A. Reilly as her attorney in such matters as required legal attention, and he had drawn the will in question.   Reilly had also acted as attorney for various close friends and relatives of the decedent and was more or less intimately acquainted with all of the beneficiaries named in her will.

Upon his qualification as executor, Stanton retained Reilly as his attorney in the settlement of the estate.   By the middle of June, 1930, the estate assets had been marshaled and were ready for distribution.   On June twenty-third, at Reilly's suggestion, Stanton, who was a resident of White Plains, delivered to the former an estate check for $16,418.80 for the purpose of making a division thereof and distribution to those entitled under the terms of the will upon their execution and delivery of usual receipts and releases. A photostatic copy of this check is attached to the moving papers herein and demonstrates that it was drawn on the Corn Exchange Bank, Plaza Branch, on June 23, 1930, to the order of Joseph A. Reilly; that it was indorsed by the latter for deposit in his personal account and paid to him through the Bank of America on the same day.

Reilly apparently got in touch with the distributees and obtained from them receipts and releases duly executed but never paid over to them any portion of the money given h'm by Stanton for that purpose.

During the succeeding year and a half, their complaints became frequent at the delay in the distribution of the estate, and in May, 1932, an order was made by this court directing the executor to account.   Such account was filed in the middle of June and was judicially settled.   In May of 1933, no payments hav ng been made pursuant to this decree, an order was issued and served upon the executor directing him to show cause why he should not be punished for contempt for fai ure to make the payments directed by the final decree.   This and all previous processes which were served upon him were promptly delivered by the executor to Reilly who promised to attend to them and subsequently assured Stanton that

this had been done. As a matter of fact, upon the return of the contempt order, the executor was adjudged in default, and an order for his arrest was issued. On June 13, 1933, he was taken into custody by a deputy sheriff of Westchester county and has since been confined in jail. Immediately thereafter the executor's brother and others made determined and exhaustive efforts to find Reilly, all of which proved fruitless. On July twenty-fourth and twenty-fifth he was indicted for grand larceny by the grand jury of Kings county but has not yet been apprehended.

An extremely full showing has been made to this court respecting the life and circumstances of the executor. He is a man forty-seven years of age, married, with one child of two years, residing at 86 Smith avenue, White Plains, N. Y. For a number of years he was employed at moderate salaries by a number of different concerns, his last employment terminating in November, 1932, at which time he was receiving a wage of twenty-five dollars per week. His only assets consist of an equity in his White Plains residence, the surrender value of two life insurance policies and bank balances aggregating $92.56. The value of the first named is problematical. The premises are assessed for tax purposes at $12,500 and are subject to a $5,000 mortgage. Affidavits submitted by an apparently competent real estate appraiser in the locality assert that the property could not now be sold so as to realize anything in excess of the mortgage. The surrender value of the life insurance policies is $686.18.

Since the termination of respondent's last employment his family has been supported by his wife, who is engaged in welfare work in White Plains.

The foregoing facts are entirely uncontroverted and are set forth with great elaboration and detail in the affidavits of the executor himself, of his brother who is intimately acquainted with his affairs, of his wife and of his attorney. In addition to this, complete transcripts of all bank accounts which the executor and his wife have had for the last few years have been submitted to the court. The latter demonstrate that no sizable deposits or withdrawals have been made in either account at any time; that the only bank accounts of the executor, personally, are in Westchester Title and Trust Company, showing a credit of $5.31, and in the County Trust Company with a balance of $87.25. The bank account of the wife in the last-named institution shows a balance of $106.81.

On July 27, 1933, the executor's attorney wrote the attorney for the unpaid distributees offering to turn over to him on their behalf the White Plains residence and the surrender value of the insurance policies. No reply to this offer was made.

The present application is for the discharge of the executor from further confinement upon the surrender by him of all of the assets which he possesses.

It is probable that any conscientious court approaches the decision of a question involving so-called contempt with extreme diffidence. Proceedings of this nature are of two distinct varieties. One is predicated upon a direct attack upon the authority or standing of the court itself. The other, of which the present is an example, is merely a remedy afforded the suitor in certain cases in tribunals of equity jurisdiction and involves no direct or, in the usual case, intentional disrespect to the judicial dignity of the particular tribunal. In certain aspects, both processes, while perhaps desirable and even necessary, appear somewhat anachronistic. The former, involving, as it does, the action of the particular court in the triple capacity of complaining witness, prosecuting attorney and determining tribunal, is, superficially at least, contrary to the accepted Anglo-Saxon standards of fair play. The latter, on the other hand, savors strongly of the long since discredited and abandoned practice of imprisonment for debt. That this remedy is an extremely salutary one in many cases involving fraud in fiduciary relations cannot be denied. Nevertheless, where such conduct is definitely negatived, as in the case of the present respondent, it is certainly not pleasing of application.

The case presently at bar is, of course, an instance of the second variety of contempt, concerning which the court said in *Cochran* v. *Ingersoll* (13 Hun, 368, 370): " The court is not called upon to vindicate either its dignity or its process, but simply to assist a suitor in the collection of a claim, and there is a solid and obvious distinction between contempt, strictly such, and those offenses which go by that name, but which are punished as contempt only for the purpose of enforcing some civil remedy." (See, also, *Basch* v. *Associated Features Booking Co., Inc.*, 92 Misc. 450, 452.)

On ordinary humanitarian principles it will be obvious that any incarceration for the violation of a direction to perform a certain act which is designed merely to vindicate the rights of a given suitor should not be continued where the effect cannot by any stretch of the imagination be beneficial to the person whose rights are thereby sought to be aided. As was said by the court in *Staples* v. *Staples* (206 App. Div. 196, 198), where it was determined that continued incarceration could not be of any possible benefit to any one: " The court should not prolong the imprisonment indefinitely, merely for the sake of punishing him."

This consideration early led to the enactment of statutes, which have been continuously maintained until the present time, permitting

the release from imprisonment of such an individual upon certain specified conditions where further incarceration could not be of any benefit to the opponent. These statutes have frequently been applied. (*Matter of Scheuer*, 161 App. Div. 528; *Typothetœ of New York* v. *Typographical Union No. 6*, 138 id. 293; *Staples* v. *Staples*, 206 id. 196; *Matter of Strong*, 111 id. 281; affd., 186 N. Y. 584; *Ryckman* v. *Ryckman*, 34 Hun, 235; *Schmohl* v. *Phillips*, 138 App. Div. 279.) The present enactment of this nature is found in section 775 of the Judiciary Law which in so far as here pertinent reads as follows: " Where an offender, imprisoned as prescribed in this article, is unable to endure the imprisonment, or to pay the sum, or to perform the act or duty, required to be paid or performed, in order to entitle him to be released, the court   *   *   *   where the commitment was made   *   *   *   may, in its or his discretion, and upon such terms as justice requires, make an order, directing him to be discharged from the imprisonment."

As a result of frequent adjudications, dating from the days of the Revised Statutes, the meaning of this enactment is not open to reasonable doubt. Obviously, from the terms of the statute, the only authority in the first instance for release of the person imprisoned is the court which committed him.

The statute expressly makes the question of release one of discretion of such court, but even a cursory examination of the deciding cases demonstrates that such discretion is purely a judicial one, subject to appellate review. (*Carogano* v. *Carogano*, 231 App. Div. 77; *Matter of Steinert*, 29 Hun, 301; *Matter of Canakos*, 60 Misc. 63; *Scialampo* v. *Ciolino*, 128 N. Y. Supp. 623, not officially reported.)

It is well established that release in such a case is not a matter of grace on the part of the court (*Van Wezel* v. *Van Wezel*, 1 Edw. Ch. 113, affd., 3 Paige, 38, 40; *Moore* v. *McMahon*, 20 Hun, 44, 45), and that the same rules of decision are applicable where the person confined is a woman as for a man. (*Matter of Hahlin*, 53 How. Pr. 501.) (See, however, *Matter of Seigrist*, 146 Misc. 236, 240.) Furthermore, although the statutory grounds for release may be present, it is entirely apparent from the decided cases that where the actions of the petitioner have been censurable in respect to the particular subject-matter and he has contributed to the finncial plight in which he finds himself, this may, and should be, taken into consideration as a possible determining factor against the relief sought. (*Carogano* v. *Carogano*, 231 App. Div. 77; *Matter of Canakos*, 60 Misc. 63; *Matter of Collins*, 39 id. 753; *Matter of Steinert*, 29 Hun, 301; *Ryer* v. *Ryer*, 33 id. 116, 118.)

Subject to the considerations just noted, the terms of the statute

provide two cases in which the offender may be released; the first is where he is no longer able to endure imprisonment; and the second arises when it is impossible for him to pay the money or perform the act required for his release. Since both of these grounds in the alternative are, by the express terms of the statute, made conditions precedent to the release, it is obvious that the primary prerequisite to any authority of the court to grant the relief must be an affirmative demonstration that the facts of the particular case fall within one or the other of these headings.

In the former case " The statute contemplates something in the nature of a slow wasting, a steady diminution of the vital forces, tending, unless arrested by sunlight, open air, proper exercise and the enjoyment of freedom, to complete destruction of the constitution, and, as a not remote consequent, death." (*Moore* v. *McMahon*, 20 Hun, 44, 45.) (See, also, *Matter of Scheuer*, 161 App. Div. 528.)

In the latter the inability contemplated by the statute must be established by extremely cogent evidence, merely the uncorroborated statement of the delinquent being insufficient. (*Matter of Canakos*, 60 Misc. 63; *Matter of Collins*, 39 id. 753; *Matter of Geyer*, 62 id. 443, 444; *Matter of Steinert*, 29 Hun, 301.) As the court states in the last cited case (at p. 303): " Upon the simple statement made by him his discharge was unwarranted, unless proceedings of this nature are to be divested of their corrective character and allowed to degenerate into a solemn legal farce." In other words, the demonstration must be such, even in the absence of opposing proof, as to satisfy the court " that the respondent has no property of any nature whatsoever and no source of income." (*Scialampo* v. *Ciolino*, 128 N. Y. Supp. 623, 624, not officially reported.)

Where, however, one or the other of these statutory grounds has been shown to exist to the reasonable conviction of the court, it is obviously its duty to terminate the incarceration since it cannot benefit any one and can only serve to inflict needless, wanton hardship upon the individual. As stated in the statute, however, this must be done " upon such terms as justice requires." Obviously the first of such terms is the grant to those whose rights have not been satisfied of the power of renewing their motion to punish by further incarceration upon a subsequent showing of a change in the affairs of the prisoner and his ability to pay. (*Matter of Scheuer*, 161 App. Div. 528; *Staples* v. *Staples*, 206 id. 196, 198.) The obligation of the prisoner to make the payments directed in the original decree is, of course, not in the least impaired by his release from imprisonment, and in the event that he becomes subsequently able to make payment, either in whole or in part, it will be his obligation to do so. This duty is always enforcible by this extraordi-

nary remedy. In addition to this saving of the future rights of the injured parties, it is obviously requisite for the prisoner to do all in his power to make satisfaction of the obligation at the present time, and the court may, therefore, impose the condition that he shall turn over to the creditors under the decree all assets which he presently possesses. (*Van Wezel* v. *Van Wezel*, 1 Edw. Ch. 113, 117; affd., 3 Paige, 38; *Matter of Hahlin*, 53 How. Pr. 501.) If this be done, it will obviously be for the benefit of the creditor to permit the respondent to go out into the world in an effort to rehabilitate his fortunes.

In the case at bar no moral turpitude has been demonstrated respecting the respondent. He violated a legal duty in intrusting to the faithless attorney the performance of the acts which he should personally have performed, but he has gained no pecuniary or other benefit from his act. His chief fault lay in the fact that he placed confidence in the same individual whom the testatrix and others interested in the estate had trusted. It is difficult to imagine how a fuller and more satisfactory demonstration respecting his pecuniary ability could be made than that which has been spread upon the records of this case. Finally, the actions of the respondent have not been so morally culpable as to warrant this court in withholding relief from him as a punitive measure in the manner indicated in some of the cases hereinbefore cited.

It follows, therefore, that it is the duty of the court to discharge him from present custody upon his surrender of the admitted assets which he possesses. These include the equity in his White Plains residence, the small balance in his bank accounts and the cash surrender value of his insurance policies. The first and last of these items have been tendered to the attorney for the distributees. It may be questionable whether the tender was sufficient and this should be remedied. If, therefore, those acting on behalf of the respondent will tender to the attorney for the beneficiaries a deed in blank of the White Plains property, duly executed and acknowledged, the insurance policies together with such duly executed papers as may be necessary to permit realization upon the surrender value thereof, and certified checks for the balances of the bank accounts as above stated, this court will issue an order releasing the respondent from further present incarceration. In the event that the tender of these items or any of them is validly made and declined, that fact may be demonstrated by personal affidavit of the attorney for the petitioner, upon receipt of which or upon due proof of the acceptance of the tender, the order herein sought will issue. Proceed accordingly.